NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0237n.06

No. 15-3043

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 04, 2016
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| PAUL DAVID MUSGRAVE, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |
| | ) | |

BEFORE: GRIFFIN and STRANCH, Circuit Judges; GWIN, District Judge.[*]

**STRANCH, Circuit Judge.** A jury convicted Paul David Musgrave on four counts of white-collar crimes. At the original sentencing hearing, the district court granted a downward variance from Musgrave's Sentencing Guidelines range of 57 to 71 months' imprisonment and sentenced him to one day of imprisonment with credit for the day of processing, three years of supervised release without home confinement, and no fine. The government appealed, and this court vacated the sentence as substantively unreasonable. *United States v. Musgrave*, 761 F.3d 602 (2014) (*Musgrave I*). On remand, the district court, again granting a downward variance, resentenced Musgrave to one day of imprisonment with credit for the day of processing, five years of supervised release with 24 months of home confinement, and a $250,000 fine. The

---

[*]The Honorable James Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

government appeals the sentence as substantively unreasonable for the second time. We **AFFIRM** the district court's sentence.

## I.    BACKGROUND

In 2008, Musgrave, a certified public accountant, became involved in a tire-recycling venture with his co-defendant, Raymond Goldberg. The two men agreed to form Dayton International Tire Recycling, which was to build, own, and operate the tire recycling facility in Ohio. Rubber Solutions, an Australian company owned by Goldberg, was to provide necessary equipment for the venture. Pursuant to Dayton International's Operating Agreement, 81% of the company was owned by Musgrave and the remaining 19% by Intercontinental Trading of the British Virgin Islands (ITBVI), a shell corporation wholly owned by Goldberg. The Agreement disclosed Goldberg as the manager, but not the owner, of ITBVI. Unbeknownst to Musgrave at the time of the Agreement, Goldberg had failed in nine previous tire-recycling ventures.

Musgrave invested around $300,000 into Dayton International, while Goldberg gave the company a $350,000 "cost reduction" on the equipment provided by Rubber Solutions. To finance the remainder of the purchase, Musgrave applied for and secured a loan, guaranteed by the Small Business Administration (SBA), through Mutual Federal Savings Bank. Musgrave had to obtain an international letter of credit through U.S. Bank in order for the loan proceeds to be disbursed to Goldberg's Australian bank. In selecting the terms for the letter of credit, Musgrave specified that the equipment should be sent in a single shipment from Australia. The loan proceeds were disbursed in April 2009.

In May 2009, the tire shredder—a "vital" piece of equipment—did not arrive with the rest. Rubber Solutions had ordered the shredder from Oregon, not Australia, but never completed the purchase due to a "cash flow problem." Goldberg's Australian bank had seized

the majority of the funds sent by Musgrave to offset an overdraft, and Goldberg used the remainder to pay his own creditors. In July 2009, Musgrave contacted the FBI, the SBA Office of Inspector General, the SEC, and Australian authorities, which prompted the FBI to commence an investigation. The business eventually failed, without any profit, and the SBA lost approximately $1.7 million.

In December 2011, Musgrave and Goldberg were indicted for scheming to defraud Mutual Federal and the SBA through concealment or misrepresentation of certain facts, including Goldberg's status as owner of ITBVI; that ITBVI provided Dayton International a cost reduction instead of a cash injection; Goldberg's falsification of a packing list to indicate that the shredder had been shipped from Australia; and the source of Musgrave's cash injection. *Musgrave I*, 761 F.3d at 605–06. Goldberg agreed to cooperate and pled guilty to one count of misprision of felony, and the government recommended a sentence of three years' probation, restitution, and a special assessment. Soon after, Goldberg voluntarily left the country, which terminated his probation, and he never paid any restitution. Musgrave proceeded to trial, where the jury found him guilty of one count of conspiracy to commit wire and bank fraud and make false statements to a financial institution, two counts of wire fraud, and one count of bank fraud.

At Musgrave's original sentencing, the district court calculated Musgrave's Guidelines range as 57 to 71 months' imprisonment. Granting Musgrave's motion for a downward variance, the district court sentenced him to one day of imprisonment with credit for the day of processing, three years of supervised release without home confinement, and no fine. Following the government's appeal, we identified two defects in the district court's reasoning: the court (1) relied on impermissible considerations (the collateral consequences of the defendant's prosecution and conviction) and (2) "failed to address adequately how what amounted to a non-

custodial sentence afforded adequate general deterrence in this context." *Id.* at 609. We did not determine that Musgrave's sentence inherently failed to promote general deterrence; we emphasized the lack of explanation, concluding that it is not our job "to second guess the individualized sentencing discretion of the district court when it appropriately relies on the [18 U.S.C.] § 3553(a) factors." *Id.* (quoting *United States v. Davis*, 537 F.3d 611, 618 (6th Cir. 2008)). We remanded to the district court to impose, within its discretion, "a sentence sufficient but not greater than necessary to serve the § 3553(a) factors." *Id.*

On remand, the district court granted a less significant variance, increasing Musgrave's sentence to one day of imprisonment with credit for the day of processing, five years of supervised release with 24 months of home confinement, and a $250,000 fine. The district court, both at the resentencing hearing and in a subsequent Statement of Reasons, gave an exhaustive explanation of the factors outlined for consideration by § 3553(a) and how those factors supported a downward variance.

## II. LEGAL STANDARD

For the second time, the government appeals Musgrave's sentence as substantively unreasonable. "The reasonableness of a sentence is reviewed for abuse of discretion, regardless of whether the sentence is inside or outside the Guidelines range." *Id.* at 607–08 (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). On abuse of discretion review, "due deference" is given to the district court's "reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the sentence." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (quoting *Gall*, 552 U.S. at 59–60). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor."

*Musgrave I*, 761 F.3d at 608 (quoting *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008)). A variance is a relevant consideration on review of a sentence's reasonableness, and "[t]he more significant the variance, the more compelling the justification based on the § 3553(a) factors must be." *Id.* (citing *Gall*, 552 U.S. at 50).

## III.    ANALYSIS

The government argues that Musgrave's sentence is substantively unreasonable because it fails to promote general deterrence, was based on the impermissible consideration of socioeconomic status,[1] and is not justified by the § 3553(a) factors as a whole. We address each of these arguments in turn.

### A.    General Deterrence

Pursuant to § 3553(a)(2)(B), district courts must consider both specific and general deterrence in imposing a sentence. *Id.* at 609 (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)). We noted in *Musgrave I* that white-collar crimes "are especially susceptible to general deterrence" and "there is a general policy favoring incarceration for these crimes." *Id.* Because the district court's view of the seriousness of Musgrave's crimes appeared "at odds with that of Congress and the Sentencing Commission," we expected the district court to "explain how its sentence nevertheless affords adequate general deterrence." *Id.* (citing *Davis*, 537 F.3d at 617; *Camiscione*, 581 F.3d at 834). We vacated Musgrave's original sentence on this issue because the district court failed to provide such an explanation. *Id.*

---

[1]We have not clarified whether a district court's consideration of impermissible factors is more properly considered procedurally or substantively unreasonable. *United States v. Romanini*, 502 F. App'x 503, 507 (6th Cir. 2012). A practical consequence of this distinction is that, to avoid plain-error review, only a challenge to procedural reasonableness must be "raised before the district court to be preserved for appeal." *Id.* (quoting *United States v. Freeman*, 640 F.3d 180, 185–86 (6th Cir. 2011)). However, because the government made the appropriate objections before the district court, that distinction is inconsequential here. *See Musgrave I*, 761 F.3d at 607–08 n.1 (citing *United States v. Chowdhury*, 438 F. App'x 472, 476 (6th Cir. 2011)).

On remand, the district court began the resentencing hearing by reviewing the case law cited in *Musgrave I*, acknowledging that general deterrence "is a valid concern," and assuring that it intended "to be responsive in imposing its sentence today." The district court then broadly examined the need to provide general deterrence, explored the legislative history of § 3553(a), and correctly explained that "[t]here is no justice in imposing a sentence merely to make an example out of a defendant." Other § 3553(a) factors must be considered, including the particular circumstances of the defendant and crime, because "[t]he punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). Following announcement of its sentence, the district court addressed at length how the sentence satisfied the need for general deterrence in this context:

> As to general deterrence, when a would-be white-collar criminal looks to the sentence imposed in this case, what he will find is that Musgrave, who the judge found was the lesser culpable defendant, was nonetheless punished by being required to serve two years on home incarceration, where the sashaying about and attending to children's dogs and the likes will simply not occur. Your liberty has been restrained, and properly so, and very significantly.
>
> So, in general deterrence, when a would-be white-collar criminal looks to the Musgrave sentence, he got sentenced to a day in prison, five years of supervised release, two years of home incarceration. Start to think about what it would be like to live for two years incarcerated in your home with no absences outside the home but for the preapproved stuff I have indicated.
>
> Moreover, he got fined a quarter of a million dollars and is required to pay back the 1.7 million in restitution, and the court imposed an aggressive payment plan.
>
> If 30 percent of the fraud defendants get a sentence with no imprisonment, here Musgrave is punished significantly in order to send the adequate general deterrence message, because he ends up with two years of home incarceration, a quarter-of-a-million-dollar fine, his liberty extraordinarily restrained.

(R. 228, Resentencing Tr., PageID 4415–16.) The district court concluded by quoting *Gall*'s acknowledgement that "[o]ffenders on probation are . . . subject to several standard conditions that substantially restrict their liberty." *Gall*, 552 U.S. at 48.

The government argues that the sentence fails to promote general deterrence in two respects. The government first asserts that there is an inconsistency in the district court's rationale. In compliance with the legislative history of § 3553(a), the district court stated that it did not "intend to create the impression that economic crimes are punished by nothing more than financial inconvenience," but it later opined that "a severe financial penalty is often one of the more effective ways to deter a greedy white-collar criminal." *See* Richard A. Posner, *Optimal Sentences for White-Collar Criminals*, 17 Am. Crim. L. Rev. 409, 410, 418 (1980) (positing that white-collar criminals are more effectively punished by severe monetary penalties than by imprisonment (citing Gary Becker, *Crime and Punishment: An Economic Approach*, 76 J. Pol. Econ. 169 (1968))). The district court's imposition of and rationale for a "severe financial penalty" ($1.7 million in restitution plus a $250,000 fine, in addition to five years of supervised release with 24 months of home confinement) does not conflict with its earlier reference to punishment of mere "financial inconvenience." *See* United States Sentencing Commission, *Guidelines Manual*, §5F1.2 (Nov. 2014) (providing that home confinement may be used "as a substitute for imprisonment").

The government also argues that the district court, in fashioning Musgrave's sentence, relied on an "incorrect understanding" of custodial and non-custodial sentences that conflated the severity of imprisonment and supervised release, as evidenced by the court's statement that *Gall* "recognizes that a non-imprisonment sentence is a custodial sentence that is a significant and severe punishment." The district court, however, clearly recognized that imprisonment is more severe than supervised release: "While a term of imprisonment is undoubtedly more severe, that is not to say that an appropriately restrictive term of supervised release, along with the imposition of fines and restitution, won't serve to deter criminal conduct." And the district

court's recognition extended to home confinement: "We know that if I sentence him to home incarceration rather than time in prison, that that is going to be a significant variance. That's true any time the sentence is non-imprisonment related." Thus, as instructed by *Musgrave I*, the district court adequately addressed how supervised release joined with home confinement and a severe financial penalty, though not imprisonment, nevertheless afforded adequate general deterrence in this context.

## B. Socioeconomic Status

In § 3553(a)(7), Congress instructs sentencing courts to consider "the need to provide restitution to any victims of the offense." At the same time, the Sentencing Commission cautions, through Guidelines §5H1.10, that socioeconomic status is "not relevant in the determination of a sentence." *See also* 28 U.S.C. § 994(d) (directing the Sentencing Commission to "assure that the [G]uidelines and policy statements are entirely neutral as to the . . . socioeconomic status of offenders"). We have interpreted the policy statement at §5H1.10 to "preclude[] a district court from determining that a defendant's prominence, or lack thereof, weighs in favor, or against, a departure." *United States v. Ferguson*, 456 F.3d 660, 665 (6th Cir. 2006) (quoting *United States v. Holz*, 118 F. App'x 928, 935 (6th Cir. 2004)), *abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85, 110 (2007). Because the prohibition "does not extend to prohibit all considerations that are correlated with socio-economic status," consideration of "various expressly enumerated permissible factors" (*e.g.*, education and vocational skills, employment record, or military, civic, charitable, or public service) do not run afoul of §5H1.10. *Holz*, 118 F. App'x at 935–36 (citing USSG §§5H1.2, 5H1.5, 5H1.11). This is also true of the factors expressly enumerated for consideration by § 3553(a), including "the need to provide restitution to any victim of the offense." *See* 18 U.S.C. § 3553(a)(7).

The government cites *United States v. Harpst*, 949 F.2d 860 (6th Cir. 1991), and *United States v. DeMonte*, 25 F.3d 343 (6th Cir. 1994), as instructive on the harmonization of § 3553(a)(7) and Guidelines §5H1.10. But these two cases were decided before two fundamental changes to the sentencing framework were made by the Supreme Court. *Koon v. United States* instructed appellate courts to review district court decisions to depart from the Guidelines range under an abuse of discretion standard. 518 U.S. 81, 91 (1996). More important for our consideration of §5H1.10, *United States v. Booker* established the Guidelines as advisory. 543 U.S. 220, 246 (2005). "After *Booker*, . . . that a factor is discouraged or forbidden under the [G]uidelines does not automatically make it irrelevant when a court is weighing statutory factors apart from the [G]uidelines." *United States v. Husein*, 478 F.3d 318, 326 (6th Cir. 2007) (quoting *United States v. Aitoro*, 446 F.3d 246, 255 n.9 (1st Cir. 2006)). *Harpst* and *DeMonte* reviewed downward *departures* made pursuant to mandatory Guidelines provisions under a de novo standard, omitting the deference to the district court that *Koon* requires. Because *Harpst* and *DeMonte* did not review post-*Booker variances* from an advisory Guidelines range, moreover, neither even mentioned the statutory § 3553(a) factors, much less envisioned that factors discouraged or forbidden by the Guidelines may still be relevant. Accordingly, *Harpst* and *DeMonte* are not persuasive here.

As for our cases decided under the modern framework, *Ferguson* declined to vacate a district court's above-Guidelines sentence based on §5H1.10. 456 F.3d at 665–66. In considering the history and characteristics of the defendant, persons similarly situated, and the need for the sentence "to promote respect for the law," as required by § 3553(a)(1), (2)(A), and (6), the district court had opined that a more lenient sentence based on the defendant's background, such as his "educational and employment history and his standing in the

community," would "simply tend to set in concrete the public perception that the higher you are, the less you have to fear from the law." *Id.* In context, we reasoned, this statement did not indicate an impermissible consideration of the defendant's socioeconomic status but represented the district court's attempt to avoid a sentence that "would lead to precisely the type of disrespect of the law that the Commission sought to avoid when it adopted § 5H1.10." *Id.* at 666. Guidelines §5H1.10 was not implicated because the comment did not demonstrate that the defendant's "'prominence, or lack thereof, weigh[ed] in favor' of or against a longer term of imprisonment." *Id.* (alteration in original) (quoting *Holz,* 118 F. App'x at 935). And because the district court properly explained the exercise of its "independent reasoned judgment," the sentence was reasonable. *Id.* at 667–68.

Our unpublished decision in *Romanini* is not at odds with our published precedent. It found that the district court "impermissibly considered [the defendant's] socioeconomic status in determining his sentence" because, instead of "an isolated statement about the defendant's status during its discussion of a § 3553(a) factor," as found in *Ferguson*, the *Romanini* district court had "repeatedly mentioned [the defendant's] wealth throughout the sentencing hearing." 502 F. App'x at 508–09; *cf. United States v. Turner,* 536 F. App'x 614, 621 (6th Cir. 2013) (concluding that district court did not consider impermissible factors where it "merely considered required factors that are correlated with socio-economic status" and where there was "no evidence suggesting that [it] considered [the defendant's] wealth and status as an independent factor weighing in favor of or against a departure").

We turn to the circumstances of the instant case. While discussing the need for the sentence to provide restitution, as required by § 3553(a)(7), and finding it "a compelling reason for the consideration of not imposing a term of imprisonment," the district court stated, "[T]he

loss amount here is substantial. However, I don't believe it has to be a permanent loss. I believe the victims can be restored by Musgrave if he is sentenced in such a way as to facilitate payment of restitution." The district court explained that, with Musgrave "doing what he's fully capable of, he's going to pay the restitution in an appropriate manner," whereas imprisonment would relegate him to 25 cents per hour for prisoner work. Responding to the government's §5H1.10-based objection at the resentencing hearing, the district court reasoned that it was required to consider "the (a)(7) factor of restitution" and, although the imposed sentence "will promote the payment of restitution," Musgrave is "not staying out to pay restitution. It's merely a factor. The other factors favor his sentence as well." The district court summarized the matter in its Statement of Reasons:

> Accordingly, here, the goal of obtaining restitution for the victims is best served by a non-incarcerated and employed defendant. This does not mean that the employment or socio-economic status of the Defendant is the basis for the Court's ultimate sentence. It is merely an observation as to the facts of this particular case, **in light of the Court's statutory requirement in imposing sentence to consider the need to provide restitution to any victim of the offense**. Here, the Court can be responsive to the victim's need to be made whole, while also imposing a sentence that is sufficient but not greater than necessary to satisfy all other purposes of sentencing, given the facts of this particular case.

(R. 210, Second Statement of Reasons, PageID 3549–50.)

Review of the district court's comments, in context, demonstrates that Musgrave's socioeconomic status, or his "prominence, or lack thereof," was not considered as an independent factor weighing in favor or against the variance given. *See Ferguson*, 456 F.3d at 666 (quoting *Holz*, 118 F. App'x at 935); *Turner*, 536 F. App'x at 621. Any remarks by the district court touching on socioeconomic status or ability to pay restitution were, like the comments in *Ferguson*, "isolated statement[s]" relevant to and made "during its discussion of a § 3553(a) factor." *See Romanini*, 502 F. App'x at 509; *see also Husein*, 478 F.3d at 326. In

exercising its discretion to impose a "reasoned and reasonable" sentence, the district court is statutorily required to consider whether, on the whole, the § 3553(a) factors—including the need to provide restitution to any victim of the offense—justify a sentence. *See Vowell*, 516 F.3d at 512 (quoting *Gall*, 552 U.S. at 59–60). That is what the district court did here.

### C. Remaining § 3553(a) Factors

As we concluded above, the district court properly considered the need to promote general deterrence and to provide restitution to any victims. With regard to the remaining § 3553(a) factors, the government quotes *United States v. Bistline*, 720 F.3d 631, 634 (6th Cir. 2013) (*Bistline II*), to argue that the district court "placed excessive weight on the few factors that favor a lesser sentence, while minimizing or disregarding altogether the serious factors that favor a more severe one." Specifically, the government argues that the district court placed too much weight on Musgrave's personal history and characteristics and the need to provide the defendant with necessary medical care, and too little on the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; the Guidelines range; and the need to avoid unwarranted sentencing disparities.

Section 3553(a)(1) compels sentencing courts to consider the history and characteristics of the defendant. Here, the district court described Musgrave's history as a successful businessman and employer of 40 people, extensive work in the community, support from his friends and family, and lack of criminal history. The district court, however, did not discuss Musgrave's history and characteristics at length and cited only Musgrave's lack of criminal history as a possible mitigating factor, while placing more emphasis on the nature and characteristics of his offenses. The district court found the remaining circumstances regarding Musgrave's history and characteristics not compelling because the circumstances, some of which

are discouraged from consideration by the Guidelines, could be found in most white-collar cases. *See United States v. Christman*, 607 F.3d 1110, 1119 (6th Cir. 2010) (explaining that only in "exceptional cases" should courts rely on discouraged facts, but that simply noting the existence of discouraged facts, without relying upon them, is not an abuse of discretion).

With regard to providing the defendant with necessary medical care, consideration of which is required by § 3553(a)(2)(D), the government argues that the district court's concern that there would be "greater potential for complications if he's ultimately incarcerated" was improper because testimony at the resentencing hearing established that the Bureau of Prisons had policies and programs in place to treat Musgrave's conditions. The district court's concern was not clearly erroneous, however, as the government's own audit report had concluded that the Bureau's policies and programs were ineffectively implemented.

Section 3553(a)(2) also compels consideration of the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." In the lengthy analysis of these factors at the resentencing hearing and in the Statement of Reasons, the district court acknowledged that Musgrave's crimes were "serious, serious, serious" but found the seriousness tempered by the nature and circumstances of the offenses—particularly Musgrave's intentions to start a business and not to "line his own pockets with someone else's hard-earned money," that he received no profit from his crimes, and that his criminal conduct included only one transaction. These findings are not clearly erroneous and are appropriate mitigations. *See United States v. Prosperi*, 686 F.3d 32, 50 (1st Cir. 2012) (affirming variance from Guidelines range of 87 to 108 months to three years of probation with six months' home confinement based in part on defendant's operation of business and lack of intent to cause harm or otherwise enrich themselves); *United Sates v. Howe*, 543 F.3d 128, 133

(3d Cir. 2008) (affirming variance from Guidelines range of 18 to 24 months to three months' home confinement based in part on crime being "isolated mistake" consisting of single-transaction fraud conducted over many months).

Section 3553(a)(4) instructs sentencing courts to consider the sentencing range established by the Guidelines. Although the Guidelines are now advisory, *Gall* admonished courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which remains the "starting point" and the "initial benchmark" for crafting a defendant's sentence. 552 U.S. at 49. Here, the district court, at the resentencing hearing, acknowledged *Gall*'s admonition and the import of the Guidelines range, began by correctly calculating the Guidelines range "so it is stated of record as a starting point," and repeatedly noted the range thereafter. The government, by recommending 30 months' imprisonment for Musgrave, agreed that the Guidelines range exceeded an appropriate sentence under § 3553(a), but now faults the district court for giving too little weight to that range. As support, the government cites *Bistline II*, where we vacated the district court's sentence in part because the district court "never mentioned [the defendant's] [G]uidelines range." 720 F.3d at 633. But here the district court not only mentioned the Guidelines range, it made it the initial benchmark and a reference point throughout.

Section 3553(a)(6) directs consideration of the need to avoid unwarranted sentencing disparities. To do so, the district court looked to the sentence of Musgrave's co-defendant Goldberg and studied sentencing statistics nationally and in the Southern District of Ohio. With regard to Goldberg's sentence, the district court made clear that it considered Goldberg, despite his cooperation and plea deal, the more culpable of the two: Goldberg had an extensive prior history of failed tire-recycling plants (initially hidden from Musgrave) and had falsified

documents so that the money, the bulk of which he used to pay his own creditors, would be disbursed. Despite the government's more lenient treatment of Goldberg, allowing him to voluntarily leave the country and terminate his probation before paying any restitution, the district court concluded that "a significant sentencing disparity between the two defendants would seem fundamentally unfair and unwarranted." This conclusion is not clearly erroneous. *See United States v. Presley*, 547 F.3d 625, 631 (6th Cir. 2008) (affirming downward variance based on co-defendant's reduced, plea-based sentence).

Based on the district court's review of statistics and other cases, of all white-collar defendants in our circuit, nearly 30% receive no prison time, and approximately one-third of that 30% receive some form of home confinement instead. The government asserts that the district court should have limited its review to cases involving losses between $1 million and $2.5 million, where "nearly 90% of defendants were sentenced to an average of 40 months in prison." But there is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances. *See United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring) (citing *Kimbrough*, 552 U.S. at 109–10 (same for crack cocaine)); *see also* Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 19 (2013) ("[T]he data suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases."). And even within the limited group proposed by the government, 10% of defendants with similar loss amounts receive no prison time, while the 40-month average for defendants who did receive prison time includes both lower and higher loss

figures. A sentence does not result in unwarranted disparities simply because it deviates from the average.

To summarize, instead of placing excessive weight on Musgrave's history and characteristics, the district court relied on all of the § 3553(a) factors, as a whole, to justify the sentence by concluding that none "weigh heavily in favor of a lengthy term of imprisonment" and that the need to provide restitution weighs against it. We find that the district court adequately explained its appropriate reliance on the § 3553(a) factors and did not abuse its individualized sentencing discretion.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** Musgrave's sentence.